GEORGE H. ZIMMERMAN, APPELLANT, V. WILLIAM G. BUF-FINGTON, APPELLEE.

FILED OCTOBER 1, 1931. No. 27722.

*Loren H. Laughlin*, for appellant.

*Claude S. Wilson, Roy F. Gilkeson* and *Hymen Rosenberg*, contra.

Heard before ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ., and HORTH, District Judge.

HORTH, District Judge.

The action is one for false arrest and false imprisonment. The parties will be referred to in the order in which they appeared in the trial court, and the question for determination is: Was the defendant immune from the service of summons in this action, he being at the time of such service the duly appointed agent of the state of Kansas under a requisition issued by the governor of that

state and addressed to the governor of the state of Nebraska asking for the extradition of the plaintiff, and by virtue of which the defendant was in the state of Nebraska at the time of such service?

On the 7th day of March, 1930, the plaintiff, a resident of Gage county, Nebraska, filed his petition in the district court for Lancaster county, Nebraska, against the defendant, a resident of Sumner county, in the state of Kansas, seeking to recover damages for the wrongs complained of in his petition, and alleging, among other things, that the defendant in swearing to the complaint which brought about plaintiff's arrest and imprisonment acted in bad faith and with malicious motives, and that the complaint did not charge a crime under the laws of the state of Kansas. On the day of the filing of the petition, the defendant was served with summons in this action in Lancaster county, and in due season filed his special appearance challenging the jurisdiction of the court over his person and claiming immunity from service under the facts in the case. It appears from the record that on the 21st day of February, 1930, the defendant filed his verified complaint with a justice of the peace in and for the county of Sumner and state of Kansas, wherein the defendant charged, or attempted to charge, the plaintiff with unlawfully and feloniously obtaining property by means of false pretenses in Sumner county, Kansas. Thereupon said justice of the peace issued his warrant for the arrest of the plaintiff and delivered the same to the sheriff of Sumner county, Kansas, who caused plaintiff to be arrested at his home in Beatrice, Nebraska, by the sheriff of Gage county, who imprisoned plaintiff in the county jail of Gage county for several hours and until he was released by an order of the district court for Gage county admitting him to bail. Thereafter said warrant, a copy of the verified complaint, and a supporting affidavit showing, among other things, that the plaintiff was a fugitive from justice from the state of Kansas, that the application for plaintiff's extradition was made in good faith for the punishment of crime, and not for the purpose of collecting a debt or of recovering

the alleged fugitive to a foreign jurisdiction with a view to there serving him with civil process, were presented to the governor of the state of Kansas, who issued his requisition, addressed to the governor of the state of Nebraska, for the extradition of plaintiff, and appointed the defendant, who at the time was a deputy sheriff of Sumner county, Kansas, as agent for the state of Kansas to present such request to the governor of the state of Nebraska for his warrant authorizing the agent to take and transport the plaintiff into the state of Kansas; that the defendant's presence in the state of Nebraska and in Lancaster county at the time he was served with summons herein was for the purpose of presenting such requisition papers to the governor of the state of Nebraska and attending as a witness any hearing thereon before such governor, and for no other purpose; that on the 7th day of March, 1930, such agent of the state of Kansas presented such requisition papers to the governor of the state of Nebraska at Lincoln, and after a hearing thereon, for reasons satisfactory to himself, the governor of Nebraska found the plaintiff was not a fugitive from justice from the state of Kansas and denied his extradition. On the same day and immediately following such hearing and before the defendant had a reasonable time in which to depart from the state of Nebraska, he was served with summons in this action.

The district court sustained the special appearance, and plaintiff appeals.

The questions presented by the record are of public interest, as they not only involve the rights of the individual litigants, but also the reciprocal duties and obligations of one state to protect from the annoyance of service of civil process an agent of a sister state who comes within its borders clothed with a requisition issued by the governor of a state seeking the extradition of one charged with a crime therein and with being a fugitive from justice therefrom, and addressed to the governor of the state in which the alleged fugitive has found an asylum.

The surrender of fugitives from justice as between the

states depends on section 2, art. IV of the Constitution of the United States, which is in the following words: "A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime."

The Constitution having established the right on the part of one state to demand from another state one charged with a crime and who flees from justice and is found in another state, and the obligation on the part of the other state to surrender such fugitive from justice, it became necessary to provide by law the mode of carrying it into execution, and congress passed the act of 1793 which, so far as it relates to this subject, is in the following words:

"Section 1. * * * That whenever the executive authority of any state in the Union, or either of the territories northwest or south of the river Ohio, shall demand any person as a fugitive from justice, of the executive authority of any such state or territory to which such person shall have fled, and shall moreover produce the copy of an indictment found, or an affidavit made before a magistrate of any state or territory as aforesaid, charging the person so demanded, with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged fled, it shall be the duty of the executive authority of the state or territory to which such person shall have fled, to cause him or her to be arrested and secured, and notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. But if no such agent shall appear within six months from the time of the arrest, the prisoner may be discharged. And all costs or expenses incurred in the apprehending, securing, and transmitting such fugitive to the state or territory making such demand, shall be paid by such state or territory.

"Section 2. And be it further enacted, That any agent, appointed as aforesaid, who shall receive the fugitive into his custody, shall be empowered to transport him or her to the state or territory from which he or she shall have fled. And if any person or persons shall by force set at liberty or rescue the fugitive from such agent while transporting, as aforesaid, the person or persons so offending shall, on conviction, be fined not exceeding five hundred dollars, and be imprisoned not exceeding one year." 1 U. S. St. at Large, 302.

A brief reference to the origin, history and purpose of the laws of the United States governing interstate extradition will be of assistance in arriving at a proper understanding of the conclusions reached in this opinion, and this we can best accomplish by quoting the language of Chief Justice Taney, in *Commonwealth of Kentucky v. Dennison,* 24 How. (U. S.) 66, 100, where, in speaking of the foregoing section of the Constitution, he said:

"This was not a compact of peace and comity between separate nations who had no claim on each other for mutual support, but a compact binding them to give aid and assistance to each other in executing their laws, and to support each other in preserving order and law within its confines, whenever such aid was needed and required; for it is manifest that the statesmen who framed the Constitution were fully sensible, that from the complex character of the government, it must fail unless the states mutually supported each other and the general government; and that nothing would be more likely to disturb its peace, and end in discord, than permitting an offender against the laws of a state, by passing over a mathematical line which divides it from another, to defy its process, and stand ready, under the protection of the state, to repeat the offense as soon as another opportunity offered.

"Indeed, the necessity of this policy of mutual support, in bringing offenders to justice, without any exception as to the character and nature of the crime, seems to have been first recognized and acted on by the American Colonies; for we find, by Winthrop's History of Massachu-

setts, vol. 2, pages 121 and 126, that as early as 1643, by 'Articles of Confederation between the plantations under the government of Massachusetts, the plantation under the government of New Plymouth, the plantations under the government of Connecticut, and the government of New Haven, with the plantations in combination therewith,' these plantations pledged themselves to each other, that, upon the escape of any prisoner or fugitive for any criminal cause, whether by breaking prison, or getting from the officer, or otherwise escaping, upon the certificate of two magistrates of the jurisdiction out of which the escape was made that he was a prisoner or such an offender at the time of the escape, the magistrate, or some of them, of the jurisdiction where, for the present, the said prisoner or fugitive abideth, shall forthwith grant such a warrant as the case will bear, for the apprehending of any such person, and the delivery of him into the hands of the officer or other person who pursueth him; and if there be help required for the safe returning of any such offender, then it shall be granted unto him that craves the same, he paying the charges thereof. It will be seen that this agreement gave no discretion to the magistrate of the government where the offender was found; but he was bound to arrest and deliver, upon the production of the certificate under which he was demanded.

"When the thirteen colonies formed a Confederation for mutual support, a similar provision was introduced, most probably suggested by the advantages which the plantations had derived from their compact with one another. But, as these colonies had then, by the Declaration of Independence, become separate and independent sovereignties, against which treason might be committed, their compact is carefully worded, so as to include treason and felony—that is, political offenses—as well as crimes of an inferior grade. It is in the following words: 'If any person, guilty of or charged with treason, felony, or other high misdemeanor, in any state, shall flee from justice, and be found in any other of the United States, he shall, upon demand of the governor or executive power of the state

from which he fled, be delivered up and removed to the state having jurisdiction of his offense.'

"And when these colonies were about to form a still closer union by the present Constitution, but yet preserving their sovereignty, they had learned from experience the necessity of this provision for the internal safety of each of them, and to promote concord and harmony among all their members; and it is introduced in the Constitution substantially in the same words, but substituting the word 'crime' for the words 'high misdemeanor,' and thereby showing the deliberate purpose to include every offense known to the law of the state from which the party charged had fled. * * *

"Looking, therefore, to the words of the Constitution— to the obvious policy and necessity of this provision to preserve harmony between states, and order and law within their respective borders, and to its early adoption by the colonies, and then by the confederated states, whose mutual interest it was to give each other aid and support whenever it was needed—the conclusion is irresistible, that this compact engrafted in the Constitution included, and was intended to include, every offense made punishable by the law of the state in which it was committed, and that it gives the right to the executive authority of the state to demand the fugitive from the executive authority of the state in which he is found; that the right given to 'demand' implies that it is an absolute right; and it follows that there must be a correlative obligation to deliver, without any reference to the character of the crime charged, or to the policy or laws of the state to which the fugitive fled.

"This is evidently the construction put upon this article in the Act of Congress of 1793, under which the proceedings now before us are instituted. It is therefore the construction put upon it almost cotemporaneously with the commencement of the government itself, and when Washington was still at its head, and many of those who had assisted in framing it were members of the congress which enacted the law."

It will thus be seen that the supreme court of the United States, in construing the laws governing interstate extradition, has said that these laws came into existence by reason of strong public necessity, their purpose being to preserve harmony between the several states, and law and order within their respective borders, and that a sense of justice and of mutual interest demanded, from the several states, a faithful execution of these laws, so "absolutely essential to their peace and well being in their internal concerns as well as members of the Union."

In *Dennison v. Christian*, 72 Neb. 703, and, again, in *In re Willard*, 93 Neb. 298, it is said: "This court is bound by the construction of the extradition laws adopted by the supreme court of the United States."

Taking what we have said for our premises, we now turn to the question of exemption from service of civil process, the reasons therefor, and the application of such rule to the case before us for determination, and in this connection cases will be cited, including one from this court, involving the immunity of nonresident suitors and witnesses from service of civil process while going to, remaining at, and returning from the place of hearing of such causes, and this, not with a view of showing such immunity to suitors and witnesses, for this is almost universally recognized by the courts wherever the common law is known and administered, but rather for the purpose of calling attention to the reasons given for the rule, foremost among them being that of public policy, the very meaning of which, Justice Holmes tells us, in *Beasley v. Texas & P. R. Co.*, 191 U. S. 492, is the interest of others than the parties, and that interest is not to be at the mercy of the parties alone.

Mr. Bowers, in his work on Process and Service, section 367, says: "There are certain officers who, as long as they remain such and are engaged in the performance of their official duties, and certain classes of individuals who, as long as they are found in certain designated situations, are not amenable to the service of civil process. The exemptions from such service may accrue from the rules of

the common law, or from considerations of public policy, or they may be expressly declared by federal or state Constitutions or legislative provision. Thus, by the comity of nations, or under the precepts of international law, ambassadors and ministers of foreign countries are not subject to the jurisdiction of the courts of the country to which they are assigned, and cannot, therefore, be served with process emanating from those courts. So, public policy forbids service on persons in the state militia or the regular army when in actual service or in going to or returning from any muster or state encampment."

In *Sofge v. Lowe,* 131 Tenn. 626, L. R. A. 1916A, 734, the court held that a suitor is not subject to service of process in an intermediate state through which he is passing in a suit instituted there, while enroute from a trial which he had attended as suitor and witness in one state to his home in another state. The court said: "The privilege of immunity from service rests upon grounds of public policy, and of such policy as it relates to a matter of supreme importance—the administration of justice. In order that causes may be fully heard and a just result reached, and that an orderly and unhampered administration of justice may be assured, the law has announced the rule of exemption. If parties to a pending cause, or their witnesses, are liable to be thus sued, they may be intimidated and prevented from complying with the foreign court's mandate, if actually summoned or subpœnaed, or from attending voluntarily as is their privilege. It is against public policy to permit them to be deterred by fear of being subjected to suit while attending, or so going or returning.

"This principle of public policy is common to Arkansas and Tennessee. Justice, in such connection, is to be conceived of as a thing integral and not partible by state or jurisdictional lines; all courts must be presumed to interest themselves alike in promoting and keeping unhampered its fair administration. The courts of this state cannot be unconcerned in respect of the embarrassment in that regard to be experienced by the courts of Arkansas if the

courts of this and other states which surround that state deny to suitors and witnesses returning to their homes from her courts this exemption from suit. Of what considerable avail is it that Arkansas extends her own protection, if the other states refuse any exertion of their sovereign power through their courts to the same end? * * * A liberal interpretation in favor of the privilege is manifested in the authorities, state and federal, and we deem our ruling to be in accord with that trend."

In speaking on the same subject, Elliott, J., in *Wilson v. Donaldson,* 117 Ind. 356, said: "High considerations of public policy require that the law should encourage him to freely enter our forums by granting immunity from process in other civil actions, and not discourage him by burdening him with the obligation to submit to the writs of our courts if he comes within our borders."

In *Mitchell v. Huron Circuit Judge,* 53 Mich. 541, having reference to the same subject, Cooley, Chief Justice, writing the opinion, said: "Public policy, the due administration of justice, and protection to parties and witnesses alike demand it."

In *Stewart v. Ramsay,* 61 L. Ed. 192 (242 U. S. 128), it was said: "Suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court and during a reasonable time in coming and going." Justice Pitney, who wrote the opinion, adopted the language of United States District Judge Kane, in *Parker v. Hotchkiss,* 1 Wall. Jr. 269. Judge Kane there said: "The privilege which is asserted here is the privilege of the court, rather than of the defendant. It is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify. Witnesses would be chary of coming within our jurisdiction, and would be exposed to dangerous influences, if they might be punished with a lawsuit for displeasing parties by their testimony; and even parties in interest,

whether on the record or not, might be deterred from the rightfully fearless assertion of a claim or the rightfully fearless assertion of a defense, if they were liable to be visited on the instant with writs from the defeated party."

In *Andrews v. Lembeck*, 46 Ohio St. 38, the court said: "The question is one which profoundly concerns the free and unhampered administration of justice in the courts. That suitors should feel free and safe at all times to attend, within any jurisdiction outside of their own, upon judicial proceedings in which they are concerned, and which require their presence, without incurring the liability of being picked up and held to answer some other adverse judicial proceeding against them, is so far a rule of public policy, that it has received almost universal recognition wherever the common law is known and administered."

In *Linton v. Cooper*, 54 Neb. 438, Norval, J., writing the opinion, said: "Public policy, the due administration of justice, and the protection of parties and witnesses demand that nonresident suitors and witnesses alike be protected from the service of civil process while necessarily in attendance upon the court. This privilege or immunity extends to the parties and witnesses not only while coming to, returning from, and in actual attendance upon, the court for the purpose of trial, but for a reasonable time after the hearing to prepare for departure. This is the settled doctrine of this and other courts."

Bearing in mind that it is a judicial proceeding, namely, an indictment found or an affidavit filed with a magistrate charging a person with having committed a crime, that, alone, can call into action the interstate extradition laws; that such extradition laws are grounded on great public policy, and "of such policy as it relates to a matter of supreme importance—the due administration of justice;" that these laws cannot function without the appointment of an accredited agent of the state seeking the return of a fugitive from justice and the presence of such agent in the asylum state, and considering that such agent might be deterred from performing his duty by refusing to go

into such state if he could be harrassed and embarrassed by being served with civil process therein upon a cause of action that arose prior to his entry into the latter state, we search in vain for a reason why the rule of exemption announced by the law, in favor of suitors and witnesses, does not apply, with all its force, to such accredited agent of a sister state. And to these reasons why the rule of exemption should apply in the present case must be added those other reasons which the founders of the federal Constitution considered so necessary to the preservation of peace and harmony between the several states, that section 2, of article 4, relating to interstate extradition, was made a part of that mighty document. When we consider the crimes of the present time, one of the most stupendous of which was committed under the shadows of the magnificent building where the sessions of this court are held, and further consider the facilities which the automobile and aeroplane lend to the criminal in making his escape to other states, the wisdom of the law and the necessity for its unhampered administration were never more manifest.

Justice Brewer, *In the Matter of Strauss*, 197 U. S. 324, sounded a warning. He said: "It may be true, as counsel urge, that persons are sometimes wrongfully extradited, particularly in cases like the present; that a creditor may wantonly swear to an affidavit charging a debtor with obtaining goods under false pretenses. But it is also true that a prosecuting officer may either wantonly or ignorantly file an information charging a like offense. But who would doubt that an information, where that is the statutory pleading for purposes of trial, is sufficient to justify an extradition? Such possibilities as these cannot be guarded against. While courts will always endeavor to see that no such attempted wrong is successful, on the other hand care must be taken that the process of extradition be not so burdened as to make it practically valueless."

An interesting and instructive case and one which in principle applies to the present case is that entitled *In re Titus*, first reported in 8 Chicago Legal News, 284. Ben-

edict, United States District Judge for the eastern district of New York, in writing the opinion, said:

"The petitioner, H. B. Titus, presents his petition for a writ of habeas corpus directed to the sheriff of the county of Kings, to the end that he may be discharged from the custody of such sheriff. The facts upon which the petitioner bases his demand for a discharge are as follows:

"On the 7th day of November, the governor of the state of Arkansas commissioned the petitioner to present to the governor of the state of New York the requisition of the governor of Arkansas for the surrender of a fugitive from justice from the state of Arkansas, named Augustine R. McDonald, together with a duly authenticated copy of an indictment found against the said McDonald by the grand jury of Ashley county, Arkansas. In pursuance of his commission and the instructions of the governor of the state of Arkansas, the petitioner as such agent presented said requisition, together with said authenticated indictment to the governor of the state of New York, who thereupon issued to the sheriff of the county of Kings, his mandate directing the arrest of McDonald, and his delivery to the petitioner, the agent of the state of Arkansas, duly commissioned and authorized to receive said fugitive, in accordance with the laws of the United States in such case made and provided. The sheriff of Kings county, on receipt of the mandate of the governor, arrested McDonald for the purpose of delivering him to the petitioner in accordance with the terms of the mandate, but before such delivery was made the fugitive was released from the custody of the sheriff upon habeas corpus issued by a justice of the supreme court of the state of New York. After being so released McDonald brought an action for malicious prosecution against the petitioner, and obtained from the supreme court of the state an order for his arrest, in pursuance whereof he is now held in custody by the sheriff of Kings county. Being so detained in custody, he presents his petition to this court, setting forth the above facts, and claims his discharge at the hands of this court upon the ground that he is detained in custody by reason

of acts committed by him in pursuance of the laws of the United States, and which are justified by such laws. Notice of the application having been given to the attorneys for McDonald, at whose suit the petitioner is imprisoned, they have appeared and, in opposition to the petition, deny the jurisdiction of this court to issue the writ of habeas corpus, upon the ground that the acts of the petitioner, which were the foundation of the action against him, are not acts done in pursuance of any law of the United States, and the further ground that the indictment presented to the governor of the state of New York, and upon which he issued his mandate to the sheriff, does not charge any crime of which the grand jury of Ashley county, Arkansas, could take cognizance; whence it is contended that all the proceedings toward the surrender of McDonald were void, and afford no justification for the petitioner, and no foundation for the interposition of this court. By the Constitution of the United States the whole subject of interstate extradition is remitted to the cognizance of the general government. * * * The act of 1793, now section 5278 of the Revised Statutes of the United States, provides the method by which such extradition is to be accomplished. That statute authorizes the executive authority of any state from which a fugitive from justice may have fled, to demand his return of the executive authority of the state to which such person has fled, upon producing to such executive a copy of an indictment found, or an affidavit made before a magistrate of the state, charging the person demanded with having committed treason, felony, or other crime, such indictment or affidavit to be certified as authentic by the governor or chief magistrate of the state from which the person so charged has fled. Upon receipt of the requisition and certified indictment, the executive authority of the state to which such person has fled, is authorized to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making the demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear.

"The petition and accompanying documents disclose plainly that the only acts charged upon the petitioner, and because of which he is arrested, are acts performed by him as the agent appointed by the executive of the state of Arkansas, in pursuance of the commission issued to him by such governor, which acts are those prescribed by act of 1793, as above stated.

"The case of the petitioner, therefore, is that of a ministerial officer acting within the scope of an authority conferred upon him by the governor of a state by virtue of the provisions of the act of 1793. * * *

"A further question presented by the petition has been discussed upon this motion, and may here be decided. It arises out of the matter charged in the indictment which accompanied the requisition of the governor of Arkansas, and discloses the judicial proceeding in Arkansas upon which the surrender of the fugitive was demanded.

"The contention upon the indictment is that it is an indictment found by the grand jury of Ashley county, Arkansas, and undertakes to charge McDonald with a crime not cognizable by any court of the state of Arkansas, the charge being subordination of perjury committed within such state in procuring one Martin to commit wilful perjury within said state before a United States commissioner in a deposition taken by such commissioner to be used in an action then pending between said McDonald and the United States.

"This indictment, it is said, is void, because it charges no crime within the jurisdiction of a grand jury of the state of Arkansas, and renders all the proceedings taken in regard to the surrender of the fugitive void; whence, it is concluded that the acts performed by the petitioner cannot be held to be acts done in pursuance of a law of the United States.

"But I cannot accede to this view. If it be true that it is competent for this court to look into the indictment transmitted by the governor of Arkansas and authenticated by him, and if this court can be called upon to determine whether a crime has been charged therein in the

manner required by the laws of the state of Arkansas, and whether as matter of law subordination of perjury committed within the state of Arkansas can by the laws of the state of Arkansas be made an offense against the laws of that state, when the perjury is committed before a United States commissioner in a deposition taken to be used in a court of the United States; still it cannot be that the petitioner, who is simply a messenger of the governor of the state of Arkansas, and who is not alleged to have done otherwise than is required by his commission, was bound to look into the indictment and required at his peril to determine whether it charged a crime within the meaning of the laws of the United States. The petitioner did not arrest the fugitive nor demand his arrest. The arrest was made by direction of the governor of the state of New York upon the demand of the governor of Arkansas. And if there can be said to have been anything done by the petitioner in respect to the arrest of the fugitive which could render him liable in an action for malicious prosecution, his acts are plainly ministerial, and he is justified therefor by the directions of the governor.

"The jurisdiction of the executive of the state over the subject-matter is clear, and the petitioner has done no more than is prescribed to be done by the laws of the United States, acting under the direction of the executive, who by the same law was authorized to give such direction. No personal liability was therefore incurred.

"Nor is the case changed by the allegation that the motives actuating the petitioner were malicious. So long as the acts done were within the scope of the authority conferred upon him, and justified by the laws of the United States, it matters not what feelings the petitioner entertained toward the fugitive, nor what result he hoped would follow from the action taken by the governor of the state.

"My determination therefore is, that the petitioner is entitled to his writ of habeas corpus as prayed for."

Plaintiff charges that the complaint which brought about his arrest and imprisonment is defective, and that it is only a general attempt to follow the language of the statute in charging the offense.

The complaint is sufficient and charges a crime within the meaning of section 2, art. IV of the Constitution of the United States. In *Pierce v. Creecy*, 210 U. S. 387, it is said: "The position of the appellant is that his detention in custody is unlawful, because the indictment which is its only excuse, is not a charge of crime within the meaning of the provision of the Constitution regulating interstate extradition. * * * The precise and only question to be determined is whether the indictment constituted such a charge. * * * Counsel for the petitioner disclaim the purpose of attacking the indictment as a criminal pleading, appreciating correctly that the point here is not whether the indictment is good enough, over seasonable challenge, to bring the accused to the bar for trial. Counsel concede that they cannot successfully attack the indictment except by showing that it does not charge a crime. The distinction between these two kinds of attack, though narrow, is clear. But it will not do to disclaim the right to attack the indictment as a criminal pleading and then proceed to deny that it constitutes a charge of crime for reasons that are apt only to destroy its validity as a criminal pleading. There must be objections which reach deeper into the indictment than these which would be good against it in the court where it is pending. We are unable to adopt the test suggested by counsel, that an objection, good if taken on arrest of judgment, would be sufficient to show that the indictment is not a charge of crime. Not to speak of the uncertainty of such a test, in view of the varying practice in the different states, there is nothing in principle or authority which supports it. Of course, such a test would be utterly inapplicable to cases of a charge of crime by affidavit, which was held to be within the Constitution. *In the Matter of Strauss*, 197 U. S. 324. The only safe rule is to abandon entirely the standard to which the indictment must conform, judged as a criminal pleading, and consider only whether it shows satisfactorily that the fugitive has been in fact, however inartificially, charged with crime in the state from which he has fled. * * * Congress, in aid of the execution of

the constitutional provision, has enacted a law (section 5278, Rev. St.), directing that the charge shall be made either by 'an indictment found' or 'an affidavit made before a magistrate;' and, as we have seen, this court has held that such an affidavit is sufficient, saying (197 U. S. 331), 'doubtless the word "charged" was used in its broad signification to cover any proceeding which a state might see fit to adopt, by which a formal accusation was made against an alleged criminal.' But it is obvious that an objection which, if well founded, would destroy the sufficiency of the indictment, as a criminal pleading, might conceivably go far enough to destroy also its sufficiency as a charge of crime. Are then the objections made to the indictment of that nature? Let it be assumed that these are all well taken. Let it be assumed, without decision, that the false statements contained in the affidavit were statements of opinion; that the assignments of the falsity were bad, because no facts necessarily inconsistent with them were alleged; that the certainty required in criminal pleading was not observed; and that the time alleged antedates the indictment by more than the period of the statute of limitations. Nevertheless, the indictment alleges that on a day named the petitioner deliberately and wilfully made, under the sanctions of an oath, legally administered, a voluntary false statement and declaration in writing, to wit, the affidavit, and that the affidavit was not required by law or made in the course of a judicial proceeding. The indictment, whether good or bad, as a pleading unmistakably describes every element of the crime of false swearing, as it is defined in the Texas Penal Code. * * * This court, in the cases already cited, has said, somewhat vaguely, but with as much precision as the subject admits, that the indictment, in order to constitute a sufficient charge of crime to warrant interstate extradition, need show no more than that the accused was substantially charged with crime. This indictment meets and surpasses that standard, and is enough. If more were required it would impose upon the courts, in the trial of writs of habeas corpus, the duty of a critical examina-

tion of the laws of the state with whose ·jurisprudence and criminal procedure they can have only a general acquaintance. Such a duty would be an intolerable burden, certain to lead to errors in decisions, irritable to the just pride of the states and fruitful of miscarriages of justice. The duty ought not to be assumed unless it is plainly required by the Constitution, and, in our opinion, there is nothing in the letter or the spirit of that instrument which requires or permits its performance."

It follows from what has been said that error was not committed by the trial court in sustaining the special appearance of the defendant.

AFFIRMED.